The next case on the calendar is Castorina v. Kijakazi Good morning, your honors. May it please the court, John Romberg for Seton Hall Law School's Center for Social Justice, representing Mr. Castorina. In a moment, my co-counsel will give two reasons why, apart from the treating physician rule, Mr. Castorina was disabled and unable to work. I will first explain why, under the treating physician rule, applicable to Mr. Castorina's claim, the same conclusion is required. Under the treating physician rule, if a treating physician gives an opinion about the nature and severity of impairment, if it's well supported by clinical and medical findings, and if it's not inconsistent with substantial evidence in the record, then it's entitled to controlling weight. Here, Dr. Dasa, Mr. Castorina's treating physician, he gave his opinion that Mr. Castorina could not perform the functional requirements of sedentary, unskilled work. Dr. Dasa was the treating physician before June of 2009. He'd already submitted a report in June of 2007 describing Mr. Castorina's functional limitations. In June of 2009, he submitted a report. A further report said, this is a follow-up orthopedic visit, said Mr. Castorina has been under my care since 2007. There's letters in the record from Mr. Castorina's had been seeing Dr. Dasa for several months prior to the 2007 report, and multiple times, three times after June 2009, Dr. Dasa repeated and adopted his prior more detailed conclusions that Mr. Castorina was completely unable to work. His prognosis was guarded, and that simply could not work. In fact, as time went on, Dr. Dasa saw Mr. Castorina between 2007 and 2013. From the time of the very detailed 2009 assessment, over the next year and a half, Dr. Dasa's assessment and very detailed treatment notes showed that Mr. Castorina was getting worse. The prognosis went from guarded to guarded to poor. He took him from being on Vicodin, which is hydrocodone, to Embedda, which is morphine, a more powerful opioid. Everything indicates that Dr. Dasa, as a treating physician, repeatedly gave his well-supported opinion that Mr. Castorina couldn't perform the sitting, lifting, or hand movement requirements of sedentary work. Let's try to be very concrete here, because I understood the district court to be saying, and the magistrate judge to be saying that, in fact, Dr. Dasa had only seen your client twice, in 2007 and 2009, and gave his opinion on those occasions. Then I understood it to be a fact that after Dr. Dasa continued his treatment. You are saying that that is a misconception, because there is evidence in the record that Dr. Dasa saw Mr. Castorina multiple times before 2007 and between 2007 and 2009. Is that correct? Yes. Yes. And there are two arguments. First, just as Your Honor is saying, that he became the treating physician before June of 2009, and in the alternative, even if he didn't, after June of 2009. Well, that's a separate question, right? I can see three possible arguments that you could make, and I want to make sure I understand them each and what the basis for them are. One is, it is simply not true that Mr. Castorina walks into Dr. Dasa in 2007 and gets an opinion about his disability, what he can do and can't do, based on an examination, of course, and then comes back again in 2009 and gets a similar report. There is evidence of treatment in the interim and even before 2007. That's one point. Then the second point, and I guess I want to ask you where I can find that evidence, the next argument is, and even if it weren't true that those were the only two occasions as of 2009, it's undisputed that Dr. Dasa continues his treatment and he reaffirms his abilities assessment from the past. And then you say, well, he puts him on stronger medication, he does different kinds of treatment, he has a bad prognosis, but is that what you're relying on or is there some more explicit, you know, I stand by what I said in 2007 and 2009. On the second version, he echoes the same language that he's totally disabled and unable to work, obviously, rather than submitting a third detailed assessment. I understand. And then the third argument that I understood is an issue in this case, it might be the one that's interesting as a matter of law, which is just academic maybe, is suppose you are the treating physician, what makes you a treating physician? And do you have to be a treating physician at the time of those two evaluations? What you've said so far is that's not even the issue here, because he's clearly the treating physician by some later date at which he continues to endorse his finding of disability. But are you also making the argument that even if it were the case, he's the treating physician because he was consulted for treatment at the time that he made this assessment of ability? You have perfectly spelled out the three different ways we win. First, the evidence in the record shows he was the treating physician before June of 2009. The evidence shows on page 119 of the record, a previous ALJ said in determining the residual functional capacity, I consider the assessment authored by DASA on June 8, 2007. So previous ALJ found he was the treating physician for the 2007 report. There's a letter from July 2007 and 316 of the record explaining that Dr. DASA has been treating for several months before June of 2007. Mr. Castorina on 302 of the record estimates that Dr. DASA has been prescribing in drugs since 2005 or 2006. So that's the before 2009. Second, on June 12, 2009, when he gives the detailed functional assessment, says this is a follow-up orthopedic visit, says Mr. Castorina has been under my care since 2007, on that day, he's unquestionably the treating physician. The commissioner's argument to the contrary is that under Monger, a 1983 case, there's a footnote suggesting that a treating physician may not be a treating physician on the first visit or two. As we argued in the brief, the reason that's not controlling is Monger was addressing this circuit's treating physician rule prior to the social security regulations governing this case. Under that treating physician rule, there was no requirement the treating physician's opinion be well substantiated, and this court had specifically held it doesn't matter how long the treating relationship is, the only thing that matters is are you a treating physician. So this court, and Monger didn't hold it, said we'd be hesitant to find. But that was under a treating physician rule which gave definitive weight, well-supported or not, to a treating physician. So the court was more understandably hesitant to say you're a treating physician early on. Post-Monger, there's no reason for that to be true. The social security regulations say now, for a treating physician, you take into account the length and nature of the relationship. One slightly different question. I'm not sure how this even bears, but there is some dispute about Cobelli, whether he was a treating surgeon. Now, he wasn't the surgeon who performed the surgery, but isn't it the case also that he was consulted for purposes of evaluation and treatment, and he referred the person who was castrated for surgery? But he wasn't someone who was consulted as an expert in litigation by the Social Security Administration. Isn't he then a treating physician too? Yes, Dr. Hirsch and Dr. Cobelli, Dr. Hirsch, except Dr. Trinise, who was a consultant. Let's assume that we agree with you that Dr. Dato is a treating physician. Could you address the government's next argument that the ALJ didn't err in discounting the defendant because it was inconsistent with other substantial evidence? Certainly, and one brief note is that whether it's well supported, the government concedes the ALJ didn't find otherwise, and this court's decision in Colgan at note four says, therefore, we don't consider that. So then the only remaining question is whether it's inconsistent with substantial evidence in the Trinise's opinion and Dr. Hirsch and Dr. Cobelli's opinion. This court in Simmons held that the opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence, and explained, and this is echoed in Colgan, that the consulting physician's opinion's report should be given limited weight. This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history, which is true here, and at best only give the groups. But to what extent are you arguing that it was error for the ALJ not to give controlling weight, but that the minimal amount of weight that he gave was not justified on this record, given all the mistakes that Trevesi made, because of which you can't take Trevesi's statement to be worth a damn, and the understanding of Cobelli as being something that he didn't do, and under those circumstances, the minimal amount, the weight that the ALJ gave to these others as against the treating physician is wrong, even if an ALJ would have been justified in saying this treating physician exaggerated. Right. So yes, absolutely, our fallback position is given the ALJ's many errors and shortcomings, unquestionably, at the very least a remand for a do-over is required. But we are primarily arguing that a remand for calculation of benefits is required under the treating physician rule, and for other reasons my co-counsel will bring up. And the reason is, there is not substantial inconsistent evidence in the record. The ALJ points to, the ALJ actually didn't mention Dr. Hirsch, the commissioner does, but Dr. Hirsch and Cobelli are hip specialists, who Mr. Castorina saw for his left hip, which was in severe pain. Dr. Hirsch saw him once, Dr. Cobelli saw him twice. Dr. Hirsch has one sentence in the report that basically says, well, his shoulders seem to be a problem, I don't see other problems. But he went to see Dr. Hirsch about his left hip, Dr. Hirsch is his hip specialist, there's no reason for Castorina to bring up, by the way, here's my incredible laundry list of other issues that have nothing to do with why I'm seeing you. The ALJ didn't even mention Dr. Hirsch. Dr. Hirsch's one sentence in which he didn't point out Mr. Castorina's other limitations are entirely insubstantial. Dr. Cobelli saw Mr. Castorina twice. In neither treatment note, does Dr. Cobelli say anything other than about the hip. The reason the ALJ said it's substantial inconsistent evidence, is he said Dr. Cobelli demonstrates that the left hip wasn't a substantial problem, even before the surgery. And the ALJ is mistaken there. What Cobelli on the first occasion said, I think this may be mild, and give you a steroid injection, and we'll send you for an MRI and come back in a month. Maybe there's a vascular necrosis. But I think this might do it. A month later, he's gotten the MRI, comes back, and Dr. Cobelli says, well, this is a vascular necrosis, you need to do something about it. So Jesse goes to Baltimore to a world renowned orthopedist, Mr. Castorina says, I think I can find one in New York City that's adequate, gets the hip replacement surgery. And another fallback position, at the very least, between the time of his hip injury and 14 months later when he gets the surgery, and when recovers from it, is a period of at least 12 months in which he's unquestionably disabled, unable to work. But what the record shows is that Dr. Dasa said, even after the surgery and before the hip injury, he couldn't perform, he could only lift zero to five pounds. Sedentary, unskilled work requires throughout the entire day, lifting up to 10 pounds. Dr. Dasa said he can sit for a total of one to two hours. Sedentary work requires sitting for six hours of an eight hour day. Dr. Dasa said one to two hours. Dr. Dasa said, with reaching, handling, pushing, pulling, he simply can't do that. He has activity intolerance, he has a severe impairment. He may be able to momentarily do it for a minute or two, but he can't do it throughout the day. And full bilateral use of the hands for at least two thirds of the, or full bilateral use of the hands throughout the day is required generally for sedentary, unskilled work. There's some jobs that can be performed if for two thirds of the day, for more than five hours of the day, you have full bilateral use of the hands. But Dr. Dasa said, no, he certainly doesn't, maybe briefly momentarily, but he doesn't have the full ability to engage in repetitive, sustained motions with his hands for any meaningful period of time, let alone for at least two thirds of the day. Each of these findings by Dr. Dasa as the treating physician is not contradicted by any substantial evidence. Dr. Treating physicians, but very briefly saying nothing about anything other than the hip and finding the hip to be serious. Dr. Trenise is the only other possible source of substantial inconsistent evidence. And as Dr. Calabresi pointed out, there's much too many reasons to think that Dr. Trenise's assessment is insubstantial. And the general rule from Simmons is they're entitled to very little weight, particularly when you have fluctuating symptoms, as Mr. Castorina did here. Dr. Trenise saw him one day after the date last insured, did not review any medical evidence, in a brief meeting said, what's going on? Dr. Trenise thought he was right-handed, he's left-handed. Dr. Trenise said he could lift 100 pounds a third of the day and carry 50 pounds two thirds of the day. He can frequently, at least two thirds of the day, climb ladders and scaffolds. Dr. Trenise's opinion, based on a very brief meeting, reviewing no medical evidence, is simply not substantial inconsistent evidence. Dr. Trenise didn't even know about the MRIs and the surgery on the left hand. Mr. Castorina comes in, he's obviously not feigning anything, he comes in on what was apparently a good day and is in relatively a good shape for the 20 minutes, maybe 30 minutes of the investigation. But Dr. Trenise did not have the basis that Dr. Dossa did over six years, over more than a dozen visits, to give the opinion at a treating physician that there simply was not the capacity to perform the skills required for sedentary, unskilled work. Good afternoon, your honors. My name is Edwin Adlam Harris and I also represent Mr. Castorina, the appellant. In addition to the treating physician rule, there are two further bases for remand. The severe impairments of Mr. Castorina's left hand and left wrist, as well as the side effects of his pain medications, which are simply incompatible with Mr. Castorina's legibility to maintain unskilled sedentary labor. First, as to his hands, unskilled sedentary work requires good use of both hands bilaterally. And the record has compelling evidence that Mr. Castorina's dominant left hand and left wrist were severely impaired. Dr. Dossa's assessments, Dr. Ford's report, as well as pages of testimony support that conclusion. We respectfully request this court remand this case for a calculation of benefits. And there is persuasive evidence of total disability on this record. For instance, Dr. Dossa's medical reports, Dr. Dossa, a board certified orthopedic surgeon with expertise in hands, found that Mr. Castorina had severe impairment of his left hand and a severe limitation in reaching, pushing, and pulling. And Dr. Ford found that Mr. Castorina's 2007 hand surgery didn't help and that he had difficulty moving his left hand still. Additionally, that there was decreased grip strength in Mr. Castorina's left hand. Further, pages of testimony spanning years for hearings before three different ALJs show that Mr. Castorina did not have full use of his left hand. Mr. Castorina was unable to use his left hand to zipper or button a shirt. He had to teach himself to use his non-dominant right hand for this regular daily activity. Mr. Castorina could not lift a gallon jug of milk. In fact, he testified that he, at best, could lift a half gallon of milk and had to use both hands to do so. This court in Celian v. Strew found that testimony that an individual could not carry a gallon of milk to be very persuasive evidence of that individual's inability to use his hand fully. And in fact, the ALJ herself found that Mr. Castorina had a severe impairment, which is defined as significantly limiting Mr. Castorina's ability to do basic work activities. This evidence is backed up by MRIs showing tears of his TFCC with perforation and slit wrist, as well as physical examinations of Mr. Castorina's left hand and wrist. Here there is persuasive evidence of total disability that would render any further proceedings pointless. Do you want to address the government's waiver argument? Yes, Your Honor. Yes. First, Mr. Castorina did raise the issues of the hands, wrist, and the pain medication below. And this we found in the reply brief on page 28. But further, this court has held, specifically in Celian v. Strew, that as long as the general argument of substantial evidence has been raised before the district court below and before the magistrate, then that preserves the subsidiary arguments that relate back to that substantial evidence argument. So here the hands and the wrist all relate back to the issue of substantial evidence. Likewise, Celian found that the duty to develop the record issue is likewise preserved as a subsidiary argument. Further, this court does have discretion to address those issues if the duty to fill out the record – you argue that that should be with respect to Ford. I think there is a lot about that. Are you also arguing that with respect to the hip surgeon, the true hip surgeon, about whom nothing was said, because we all seem to think that Covello was a hip surgeon when he was. Now, is that the duty to fill out the record that you are addressing? That's correct, Your Honor. Yes. We are stating that because Dr. Stuchin – there was not sufficient evidence in the record to fully – excuse me – that if the ALJ failed to find sufficient evidence to review Dr. Stuchin's beyond the report that is in the record, that the ALJ should have, following the duty to develop the record, therefore, looked into additional information. But, of course, because the ALJ mistook Dr. Covelli to be the treating surgeon and didn't address Dr. Stuchin in that case. And so that's an error in itself, that whether you cure that error by saying you should have looked at Stuchin is another question. Yes, Your Honor. And that error should have been cured from multiple perspectives, Your Honor, but ultimately, yes, as an alternative, the ALJ should have developed the record around Dr. Stuchin. Those reasons, Your Honor, we respectfully request that this Court remand this case for calculation. Just one question about Dr. Ford. Does the ALJ have – the ALJ certainly doesn't have any authority to require Dr. Ford to rewrite his old notes in a more legible handwriting, right? No, Your Honor, that is true. Is there a reasonable prospect that you could ask a doctor to take notes from several years earlier and rewrite them? And this is not a question of, you sent me a bad copy, I can't read the copy. The problem is his handwriting, not his photocopier. Yes, Your Honor, that is true. I mean, while the ALJ is unable to compel the doctor, Dr. Ford, to rewrite the notes, the ALJ… A reasonable request to ask the doctor to rewrite his notes? Yes, Your Honor, I think it is a reasonable request, at least in as much as to clarify the notes that presumably the doctor can read his own handwriting, even if the ALJ is unable to. But moreover here, the ALJ didn't even comment on Dr. Ford's report. It's at the very least, if you cannot read a report from an important doctor, that asking, can you help me, the person may say no, and that may be fine, but that at least a sensible person says, give me a hand. Yes, Your Honor, that is the case, that here the ALJ should have at least a reasonable request to ask Dr. Ford to rewrite his notes. Your Honor, may it please the court to assist the United States Attorney Joseph Pantoja for the commissioner. In this case, the plaintiff raised several arguments, and we have explained why three of them were weighed, but not having been raised below. There is no dispute that, although plaintiffs raised the alleged failure of the ALJ to address its pain and side effects and hip and wrist issues, and that also failed to properly develop the record, these issues were either not raised in the initial motion to the district court or in the objections to Judge Moses' detailed reporting recommendation. And Judge Nathan, at footnote one of the opinion in adopting Judge Moses' report, made clear that he had clear error to those portions of Judge Magistrate Moses' report that were not specifically objected to, and that raised further judicial review. So first we have either he didn't raise it in the motion to Judge Moses on the report, or he then failed to object to the report on the issues that he is now claiming for the first time in appeal. And with respect to the main issue that we feel was not weighed, the ALJ properly weighed the opinion evidence and was not required to accept an overly restrictive... Yes. You have DASA's report. Yes. It may well be exaggerated in terms of what some of the other people say, but the ALJ gave dominant weight to Tabarese, whose report is manifestly absurd from somebody who, in terms of being consistent, inconsistent with what everybody else said, from somebody who, with respect to the issue as to which arm, even didn't know the right arm. So isn't that error enough, apart from everything else, to say, at the very least, this must be sent down for re-argument? The question of whether there's enough more is another matter, but I must say that the ALJ's relying on this... Okay, let's say, let's ignore for the fact that he's hired by the government, that comes in which says something that is totally inconsistent with what everybody else says and doesn't even know which hand is the right one. Isn't that error enough? Your Honor, I respectfully disagree. The ALJ, for one thing, DASA's overly restrictive opinion was not actually adopted by any other doctor. And the ALJ himself noted various instances in which those clinical findings were at odds with not only his own relatively mild clinical findings, but also the clinical findings and assessments of the other doctors in the record, including Dr. Finessi. That he could lift his hip out, that he could do... The ALJ ended up not crediting that portion of Dr. Finessi's opinion... And yet he gives great credit to a doctor who would say something like that. I mean, that just puzzles me. I mean, you know, if somebody is that wrong, we used to say, we don't need to go that far, but there's plenty of falsehood here. Your Honor, that aspect of Dr. Finessi's opinion with respect to the amount of weight that he was able to lift out of the residual frontal capacitor, that was a very exertional part of the residual frontal capacitor. And the ALJ actually credited Dr. DASA's opinion to the extent that he was claiming that Castorina's functionality was closer to that, or actually below sedentary. If Your Honor, if I could just remind Your Honor that the ALJ's RFC capacity determination was for a reduced range of sedentary work, which is the least restrictive exertional category. So considering the fact that Finessi found that he could do much more exertionally, it is pretty clear that the ALJ actually credited Dr. DASA's opinion in that regard. And then with respect to the other aspects of the ability to work regarding shoulders and things like that, the ALJ did find some restrictions with respect to the shoulders. You can't reach overhead with the right arm. You can only frequently use the left arm, left upper extremity, for reaching, handling, and feeling, which again, in light of the fact that Dr. Hurst did not find plaintiff so limited, and the fact that Dr. Cabelli in his statements of review of symptoms and that only the left hip was symptomatic, and even then he could fully waive her, etc., it is clear that the ALJ must have given significant credit to Dr. DASA's opinion, because that is the only opinion that would justify the ALJ getting that low in terms of the exertional capacity that we see in the RFC determination. And with respect to Dr. DASA's opinion, the ALJ reasonably found that it was overly restrictive compared to his own clinical findings, because with respect to the lifting and carrying limitations the doctor assessed, his clinical findings on that date, in June 2009, included normal right shoulder range of motion, and only slightly reduced left shoulder motion, and intact neurological findings. And Dr. DASA's progress notes from mid-2009 through late 2010, so this takes you after the date last insured of September 30, 2010, there were no clinical findings regarding the hands and wrists. This is throughout the whole time that Dr. DASA evaluated the plaintiff since the June 2009 opinion, and the DLI of September 30, 2010. And Dr. DASA repeatedly diagnosed cervical spine, sprain, and strain, with respect to cervical spine, and lumbar spine disc bulging that resulted in radiculopathy. But the 2009 MRI of the cervical spine was normal, and costa rena only had straight leg raising intermittently. And, but also, Dr. DASA's clinical findings were inconsistent with the functional clinical findings by the other doctors of record. Dr. Hirsch, for example, yes. Yeah, which ones? Yes, yes. Specifically as to the same things that we're talking about, or whether we're talking about different types of things, because we hear so many different things. Again, some doctors talking about one, and some doctors talking about the other, and then also some confusion as to what doctors did what, so that we're talking about what Covelli said about something he didn't do. That's what, you know, I really don't understand what's going on here. Well, one of the reasons is that, in fact, that difference, that the difference in what the doctors were addressing is that Dr. DASA, for some reason, never even mentions costa rena's hip condition in the June 2009 opinion, despite the fact that costa rena testified that he allegedly became symptomatic of spikes of the left hip in December of 2008. He was, he first saw treatment in February 2009, and was diagnosed in April 2009, and then had the surgery in January 2010. Yet, Dr. DASA's 2009 opinion makes no reference to the hip condition, and his progress notes after that only reference that costa rena had surgery in January 2010, but then doesn't note any complaints, when this is supposedly the main issue that kept costa rena from being able to work. He testified that, in one of the hearings that he had, he testified that it was not until December 2008 that he had the left hip problems, and that before that, he was fine. And then, just like that, all of a sudden, because of the left hip problems, he could no longer dance, and everything changed. That's what he testified to. Now, can you just answer me why one shouldn't get the very least, get more information from a hip surgery? Well, for one thing, with respect to Dr. Stukin, that progress note in November 2011 was more than a year after the date last in short, and there's nothing to suggest, one, I mean, the plaintiff hasn't shown that that progress note of November 2011 was necessarily inconsistent with the ALJ's RC determination. Second, there's no indication that that November 2011 progress note, whatever it noted, we laid it back to prior to the date last in short. Is it that a situation in which the ALJ has some duty to find out what happened in his hip surgery, when the ALJ thinks it's a different surgeon who wasn't really talking about it, and he could find out, but when he said that, to a record, I'm, you know, I'm inclined not to go that far on Dr. Ford and say that we should put Dr. Stukin at the very least, shouldn't we? It is true that the ALJ misidentified Dr. Cobelli as the treating surgeon. He is an orthopedic surgeon, but Dr. Stukin was the one who performed the surgery, but it doesn't change the fact that it was the ALJ's prerogative to find Castorina's functioning from his alleged onset date through the date last insured, and that was more than a year before Dr. Stukin's progress report, and there is no indication, and certainly the plaintiff hasn't carried the burden, of showing that Dr. Stukin's progress report was actually inconsistent with the ALJ's RC determination, let alone that it related back to prior to the date last insured. But going back to your honor statement with respect to what did the other doctor say about the functionality of Castorina, Dr. Das' overly restrictive opinion was in June 2009. Just a few months before that, Dr. Hirsch, who is a colleague of Dr. Cobelli, found that he only had less hip pain, and that the other systems, the shoulders, the knees, etc., were all essentially unremarkable. So Dr. Hirsch did more than just review the left hip complaint in February 2009, contrary to what counsel said, he looked at other things, same thing with Mr. Cobelli, he said there was a review of symptoms, but only the left hip pain was an issue. You're saying that the question of medication was weighed? Yes, yes, it was weighed because it was specifically, yes, yes. Yes, and it was only Dr. Dasa who found muscle atrophy, swelling, spasm, were trigger points with respect to Castorina, no other doctor did that. And Dr. Hirsch noted, as I mentioned, that Castorina had good movement and function of the hands, the wrists, and elbows, as well as the right shoulder. This was all within the date last insured, as opposed to Castorina's reference on progress notes by Dr. Stukin, one in a year after the date last insured, and the progress note by Dr. Ford, with respect to the hand and wrist, months after the date last insured, which again, have not been shown to be necessarily inconsistent with the ALJ's RFC determination, or that Dr. Ford had made statements that relate back to prior to a physician. Wait, sorry, let me rephrase that. The ALJ's duty to recontact a physician does not arise unless the ALJ has insufficient information upon which to evaluate the doctor's findings. It is not triggered, as in the case here, by a doctor's opinion that is inconsistent with his own medical findings, and inconsistent with other substantial evidence of record. So counsel has simply misconstrued what the duty is, in terms of recontacting a doctor, when there are inconsistencies in the opinion, either with his own clinical findings or that with other evidence. I'm talking about duties to fill out the record. Right. Gaps in the record. In this case, your honor, if I may, there is no dispute that the record was complete through the date last insured. There are no gaps. What counsel has argued is that the ALJ should have asked for information, documents, and other opinion from doctors that treated him after the date last insured, in the hope that they could shore up the deficiencies that the ALJ found with respect to Dr. Das' opinion, being that the record simply did not support those overly restrictive assessments. That is not what the duty to develop the record requires. It was plaintiff's burden to show that he was more restricted than the ALJ had found, and the plaintiff has simply not carried that burden in this case. Just one more thing here. With respect to the waiver argument, I just wanted to note that counsel relies on Selian, but totally overlooks a holding in Selian that was more apt to this case. In Selian, the court found that the plaintiff had waived any argument that the ALJ had not properly evaluated his testimony regarding the credibility of his testimony regarding pain. So Selian actually supports the waiver argument here. And then we have Pupori, this court's decision in Pupori, where the court found that a claimant must present in a counsel case, in a social security case, at least where the claimant is represented by counsel, the claimant must present the relevant legal arguments in that forum in order to preserve them for the appeal. And then we have the case in Wersen. It's a summary order that this court issued. Wersen, 726 Fed Appendix 839, going toward the argument of whether the ALJ had properly developed the record. In that summary order, this court noted that the contention that the administrative law judge had a duty to counsel was waived. It's a summary order. I'm sorry? It's a summary order. Yes. But I just bring that to the fore to note that this court has addressed a record development issue and found that it was waived. Because the duty to contact the doctor, that issue is a record development issue. And so counsel's argument in the reply brief that there's somehow a distinguishment here based on the fact that the ALJ has an affirmative duty to develop the record, that doesn't change the analysis here with respect to waiver. He either presented the argument sufficiently below and he had two chances on his motion and then with the objections to the report and recommendation, and it was not raised properly either in one or the other. So, Your Honor, oh, and just one final thing. With respect to remand for calculation of benefits, sorry, payment of benefits. Yes. Yeah, in this case, despite the fact of the long delay, which we do not dispute this case has been around for a while, the delay was not the agency's fault and the agency counsel has not established that. It was only recently, the prior remand, that the full adjudicated period was actually addressed because there was a problem with the date last insured that even counsel did not note until, in fact, it was the appeals counsel that noted in the last remand that the date last insured was incorrect. So it was only, this case has only gone back once, you know, where the administrative law judge has actually addressed the full adjudicated period. And in this case, for the reasons explained by the administrative law judge, the application of the correct legal principles does not mandate a conclusion that the ALJ, that the commissioner cannot carry its burden showing that there's work the plaintiff could perform. And therefore, remand for just the payment of benefits is not the right course. It should be remand for further proceedings if the court were to find that there was reversible error, which of course we argue that there was none in this case. If Donna has no further questions, we'll rest on it. Thank you. I'd like to focus on why there's no need and it would be improper and unnecessary to remand for a do-over and development of the record because this record demonstrates that Mr. Dobson's remand does not include a remand for a do-over, including on a commissioner's burden to show that there's sufficient jobs in the national economy. The commissioner acknowledges that the ALJ credited Dr. Dasa as to the exertional capacity of lifting. Dr. Dasa said zero to five pounds occasionally. Sedentary work requires lifting 10 pounds throughout the day. The ALJ credited that and the ALJ doesn't say otherwise, says he can do sedentary work. Sedentary work requires lifting 10 pounds constantly throughout the day. Dr. Dasa says zero to five pounds occasionally, up to one-third of the day. Can't do sedentary unskilled work. Second, Dr. Dasa says he can sit for one to two hours, not for six hours. Can't do sedentary work. As to the use of the left hand and the waiver, if it exists, goes to beyond the treating physician rule. But Dr. Dasa says Mr. Castorina simply can't use his left hand to perform the repetitive sustained motions required of sedentary unskilled work. Dr. Trenise said he can do it for two-thirds of the day. He can fully use his left hand. The ALJ agreed with Dr. Trenise. There's simply no way on this record. Dr. Trenise was, again, a one-time consultant, didn't consult any medical records, specifically asked Castorina what's going on with your left hand and wrist. Castorina said I don't know my diagnosis. Dr. Dasa talks about the perforation of the TFCC, the ganglion cyst, the tear of the scapulate ligament, talks about the problem with the ring finger, says that the deflection and torsion of the wrist are inadequate. I don't know whether those are rather mild clinical findings. Neither does the ALJ. Dr. Dasa does. And in order to overcome Dr. Dasa's sense that he knows enough from the MRI, from his observations, that Mr. Castorina can't meaningfully use his left hand, let alone for two-thirds of the workday, there simply is no way to read this record to conclude that he can lift 10 pounds throughout the day, rather than what Dr. Dasa said, that he can use his hands up fully for six hours throughout the day. Thank you. Your Honors, two points on rebuttal. Dr. Dasa is the treating physician, and as my co-counsel has pointed out, Dr. Trenise does not constitute substantial evidence in the record. But even looking to Dr. Trenise's report about Mr. Castorina's hands, Dr. Trenise found that Mr. Castorina was still limited into the use of his left hand, only as much as frequently during the day. But Dr. Trenise did not have MRIs. He did not review the medical history. He didn't even take medical history by the record from Mr. Castorina as to his hands. Further, Dr. Trenise misunderstood that Mr. Castorina's right hand was his dominant hand, while it's actually his left hand, which is the disabled, the impaired hand. And so that alone makes it so there's not substantial evidence on this record to find other than Mr. Castorina's left hand was severely impaired and could not be used. He did not have full bilateral use of his left hand. And based on the vocational expert's testimony, the statement in 2013, without full bilateral use of the hand, Mr. Castorina could not do sedentary unskilled work. Moreover, as to the waiver issue, the commissioner states that we've waived the, Mr. Castorina's waived the issue of the pain medications. But the commissioner himself, the commissioner herself raised this issue before the district court. And let me point you to, in the, in the R&R, there was a discrete section discussing the pain issues. That discrete section did not exist before the district court. Mr. Castorina did bring up issues related to the pain medication before the district court, specifically symptomatic pain relief and pain management. But moreover, Mr. Castorina has the issue that the effects of this medication was that he could not drive. And these are known effects of Vicodin, of Percocet. It inhibits a person from driving to work. The commissioner, in their reply brief to the objections, specifically stated, took issue with Mr. Castorina's ability to drive. And this is on ECF 34 at five. And then, and that relates back to Mr. Castorina couldn't drive using R&R products. And so for that, even alone, that preserves this issue before the court. Thank you, your honors. Thank you all. And we'll take the matter under advisement. We appreciate the assistance of you all in this matter. Hey, good morning, your honors. My name is James Mara. I'm the pro se litigant in this case. I appeal to this court to reverse the decision of the district court, which is based on race discrimination. I stand here today, still a strong teacher at a charter school in Brooklyn. There are no issues at my current school, which I am currently have experienced the last five years. I was hired in regards to this current case in 2016, 2017 school year. At the time where the not a good fit comment was made, I was at a school in the Bronx, New York. The entire administration of that school was African American and or Haitian American. The entire student body was also minority students, African American and or Hispanic American. I met this principal at a jobs fair not too far from here. And the board of ed said to branch out to other boroughs in terms of the best chance of getting a job, which is what I did because I had no prior experience as a teacher at the time of this. So again, there are similarly situated teachers that I mentioned in my case. Mr. Mara, I have a question. There was an assault. It was things were put in your record. You don't know anything about that assault. What happened? You know, I find it very hard to understand what people have said without the context of that. Now, if it isn't in the record, maybe it isn't in the record. I wish I could know what happened. Well, another student came into my classroom who was not my student. I asked to leave. He threw a little tantrum. He was escorted out. There was investigation by the school and they determined he was at fault. And he was not a student in your class. Well, I wasn't on my roster. No, I'm sorry. He was not on my roster. But after that is when they determined he was not a good fit, which was then later said at the hearing, at my discontinuance trial, I guess, whatever you want to call it, with the actual police. I was found to be not liable for that assault. I mean, then again, what am I going to do? I can't go there. No, no. But see, what I wondered whether that incident was an indication of a young teacher's incapacity to control a class, which is a very different thing. But you're telling me this was somebody who came from the outside and had nothing to do with that. Yes, it was not on my roster. It was clarified. There was nothing. I was found. But before that, things were said by the principal. It was just constantly building. And again, even if a young teacher like myself, who I still terminated, which is what the next part was, probation discontinuous is a tough standard. There are a lot of other circumstances that for me to explain would take too long between the education law, the union law, and the chancellor's regulations. There's a lot to do in terms of how I'm actually, you know, discontinued. So again, after I received two letters to file for potential wrongdoing, it was a fire drill. The principal claimed that she saw me through the window, which, I mean, it's clear that no one could look through it. But then again, I also had two more observations after that, which were barely in the ineffective range. As the appellee said in their case, any disprobation on a teacher can be discontinued for any legal reasons or no reason at all. And no reason at all. It's like there has to be a reason. I mean, there were reasons. She said at the hearing, it's on tape, you know, she actually said not a good fit as the main reason why. It wasn't the letters in the file. It wasn't her ineffective ratings. It was that. It was... ...situated individuals who were treated in this way. And I wanted to ask specifically about the two drills. I'm saying that the complaint says, or maybe the allegation, that there were other teachers in the hall who were not cited for that. Yes. Three were not. Two were African-American, one was Filipino-American. And me and another teacher who were both white were cited for the exact same reasons on the exact same days. And also the co-comparators that I said were let go, one was Asian-American, another teacher was African-American who was actually still at that school, or was, I don't know if he still is, as of today. But they were eligible for discontinuance and were not. I was. You know, they gave us four years on our probation. That was after one year. I don't understand the story of the drills and why the other people on the corridor were similarly situated. The complaint doesn't say anything about the doorframe. Yes, she said she could see me through the door. I would say they needed to build a case to get rid of me because... Well, I don't understand the fact. Yes. I thought you said there was a fire drill, it's not an active shooter drill or something like that? No. I'm not a fire drill. An active shooter drill, yes. For soft lockdown. Do I understand correctly that the idea is everybody's supposed to hide in such a way that they can't be seen from the door? Correct. Yeah, and I was in the back, I was kind of hiding, but I mean, she kind of looked through and whatever. But the other... She said she didn't. What is the basis for thinking that the other people were not hiding? I mean, she needed a case against me and that was the easiest thing. I mean, what I... Well, but I mean, you're saying that there were other people... Yes. Who were similarly situated, but similarly situated in what sense? Were they... They were all teachers? They were eligible to be cited like I was? Well, but... But why? I mean, if it's one... You know, if somebody is... If two people violate the same rule and one of them gets terminated and the other one doesn't, that's one situation, but I don't see any real allegation that the other people did the thing that you were accused of that there's a false allegation that you could be seen? I assume so, yes. I mean, it was practice. It was... No, but explain to me. Are you saying that you could not be seen? I was saying, yes, I could not be seen. I was in the back, yeah. They also could be seen. Which of these two? I could not be seen. I was in the back. I was... Oh, I see. Behind my desk, you know, it's... Pretending there's a gunman in the building with the school and obviously the mindset is to hide so the gunman passes the classroom. So everyone remains quiet and they could just move on. And I was in the back. I... I don't know how stuff got hit. It was an older school. There was some closets that were locked. Their desk, they hide under your desk and, you know, the lights were off and she claimed she saw me. I don't know if she did or didn't. I mean, it's a clear doorway. You could say anything you want. What I'm trying to say is that was after the not a good fit was set and she, um, needed a case against me. I said I had no absences. I had no other thing to get me on and I needed a case and this was going to do it. Okay. I understand. May it please the court. Kate Fletcher for the appellees. Um, I would like to just point out the lack of allegations in this case. And the simple fact is that Mr. Morrow has not presented any factual allegations that can reasonably support an inference of discrimination, which is a necessary element to his claim. Excuse me. The not a good fit comment is essentially a neutral comment. And without any kind of additional context to create... Why is it neutral in a situation where he is the only white person to say you do not vote? Why isn't that, and haven't we in other cases suggested something like that, suggest racism? I would argue in this case, it's similar to use of the Vassar College, where it was found that it was insufficient to raise an inference of discrimination based merely on the fact that the other people were white and the plaintiff was Bengali. And the simple fact here is that there is no racial connotation to that statement. It came after a disruption in the classroom. It is unclear exactly what happened because those facts were not alleged in the record. But we have been very clear that the prima facie case is a very easy case. I am really more interested in whether there were reasons for firing or for not keeping that are not protected. In many of these cases, we either say there is a prima facie case or arguendo that it is a prima facie case, and then we look to the other reasons. So I'd like you to give me some ground for saying that what happened was not protected. Well, in this instance, Mr. Morrow was cited on two occasions for violating the active shooter procedures, which is a safety issue in the school. In addition, he received ineffective ratings on two occasions. He was also looking at the active shooter drill. The complaint alleges that another white teacher was similarly cited, and the complaint was not drafted by a lawyer, and that there were other teachers who were also in the hall, but who were not cited for this infraction. So I read the complaint as attempting to say there are some similarly situated people who were not cited, and another person who happened also to be white was cited, and this raises some inference of discrimination. I understand that this is a minimal burden, but we still have to raise some sort of factual allegation to support some sort of inference of discrimination, and in this case, the mere fact that they were nonwhite and in the same hallway is not sufficient. It's not an allegation that they themselves violated the procedures of the active shooter drill. He didn't allege that they violated the active shooter drill, even on information and belief. That allegation was never made, so it is not reasonable to say that they are similarly situated in all material respects, where there is no even... Who has had multiple opportunities, even after a motion to dismiss, where all of these arguments were raised, he had multiple opportunities to amend and to correct the pleading deficiencies. I understand this is a pro se plaintiff, and they are afforded solicitude. However, again, he had the opportunity to simply allege upon information and belief that he believed these other features had also violated the safety procedures. There is no such allegation in the complaint after two opportunities. He supplemented his original complaint on two occasions. It is a different argument. It's one he has not made before. It's one that he did not allege in his brief in front of this court or below in the district court. I would say that there is no basis to say that the principal was lying in this case. According to what he has just said, which is new information, the principal looked through the doorway and could see him, and that was a violation. He said that he was sort of hiding before you today, which is not the same thing as actually hiding. I think more critically, this is the first time he has made any allegation that the principal falsified her report that he violated the active shooter drill. That claim is not argued before this court and is being made now for the first time on oral arguments after he had an opportunity to even raise it on reply, which he chose not to use, after he had an opportunity to raise it in his opening brief, which he chose not to do, and had multiple occasions in the district court to raise that allegation. It is simply not here. That is the nature of this case. There are a lot of allegations that minimally could have supported his claims, but they are not here. They are not made. The fact that there is no factual basis to support an inference, even a minimal inference, even a minimal factual allegation... Can you tell me what you don't fit means? What it can go to? I think you don't fit. For example, he alleged, and he made the other allegation, that the principal thought he was a young teacher who should be teaching younger students. That is an example of a way in which he did not fit in the classroom that he was in, in the school at the time he was teaching, that is completely race neutral. It has nothing to do with anti-white bias or anti-white animus. It is simply a fact that you can say, especially after a situation in which you're unable to control your classroom, even if the person was not a student who was supposed to be in the classroom, to say you're not a good fit... That's why I ask, if the person was in the classroom, I can understand very well. Somebody who comes out of the classroom, he doesn't tell me much about whether a young teacher can control the classroom. Well, again, the allegations that were made in the district court and before this court in briefing are quite minimal as to the specific circumstances of that incident. So what we know is that there was an allegation of some sort of an assault, and we know that there was a classroom management issue, and we know that that statement was made. But beyond that, there is nothing to suggest a racial overtones or bias in this case, and the plaintiff simply has not met the minimal pleading standards. Thank you for your time. Tomorrow we have one minute of rebuttal. Okay, yeah. Like I said, there was also a hearing in which their people said there was no business reason for this to take place. Even if all that was true, I guess it kind of is true or not true, but there was no reason for this. I had four years. I think every teacher in the world has trouble with classroom management. The not a good fit comment was made multiple times. It was made in the actual hearing for everyone to hear. You could say it was a hostile work environment, even after I was terminated, however you want to see that. I'm just asking to have discovery here flush this out of whether people were spied. I don't know. I don't have access to their records. I truly don't know if they were or weren't. Same thing with everything else here. I don't know. I had a similar situation. If Ms. Zeebo or a person I mentioned were tenured, they wouldn't be, and then I would guess I would be wrong. But I don't know, and they just keep throwing what's the standard. In that lockdown, I don't know what happened. It was practice. It was practice for what was happening, and I have not seen one happen. For instance, if I got terminated for being excessively late or the chancellor's regulation showing up late under the influence, whatever it is, I can't argue that. It's a fact. This is practice for a drill. And plus the union said I can't refute that. They scrapped it. I don't know the union law. I couldn't argue that. All I could do is put in something and say, I disagree with this. And that was it. The union law, like I said, there's a lot going on here. Hypothetically, were it she didn't discontinue me, I would be guaranteed my job back based on current laws, and there's a lot of laws. There's city laws, union laws, state laws. The best way to get me that school was to do this. And it's a mark on my record. I get that. And things change. There's a lot. I'm just asking to maybe get some more discovery to flush these things out. Well, thank you both. And we will take the matter under advisement. That is the last case to be argued on the calendar this morning, this afternoon. So I will ask the deputy to adjourn. Thank you.